David PETERSON, Plaintiff,

v.

**INSTAPAK CORPORATION and Sealed Air Corporation, Defendants.**

No. 86 C 3498.

United States District Court, N.D. Illinois, E.D.

July 14, 1988.

Michael J. Martin, Dunn & Martin, Ltd., Joliet, Ill., for plaintiff.

John D. Donlevy, Mayer Brown & Platt, Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Plaintiff filed this personal injury action in Circuit Court in Will County against Instapak Corporation on April 18, 1986, exactly two years after he was exposed to the isocyanate fumes that allegedly injured him. Instapak is a subsidiary of Sealed Air Corporation, which holds the rights to the Instapak trademark but does not manufacture any products. Sealed Air, the manufacturer of the product containing isocyanate, did not receive notice of the action until April 23, 1986. Instapak removed this action here, and in June 1986 plaintiff amended his complaint to join Sealed Air as a defendant.

On May 6, 1987, this court granted summary judgment to Instapak because it did not manufacture the product that allegedly caused plaintiff's injury. We also dismissed the claim against Sealed Air because, according to the pleadings, plaintiff's cause of action accrued on the date of his exposure and Sealed Air did not receive notice of the action until after the two-year statute of limitations had run. We gave plaintiff the opportunity to replead his action against Sealed Air, noting that he might benefit from Illinois' liberal "discovery rule" which, if applicable, would commence the limitations period when plaintiff knew or reasonably should have known that he was injured as a result of Sealed Air's allegedly wrongful conduct. *See Knox College v. Celotex Corp.*, 88 Ill. 2d 407, 414, 430 N.E.2d 976, 980, 58 Ill.Dec. 725, 729 (3rd Dist.1981).

Plaintiff did file a second amended complaint, but on February 8, 1988 this court determined that plaintiff's action remained barred and we dismissed his claim. In so doing, we concluded that Illinois courts would not apply the discovery rule because "an action to recover for personal injuries resulting from a sudden traumatic event accrues when plaintiff first knew of his right to sue, *i.e.*, at the time when the injury occurred." *Nolan v. Johns–Manville Asbestos*, 85 Ill.2d 161, 166, 421 N.E. 2d 864, 866, 52 Ill.Dec. 1, 3 (1981) (quoting *Williams v. Brown Manufacturing*, 45 Ill. 2d 418, 432, 261 N.E.2d 305, 313 (1970)). Because it was inconceivable to us that plaintiff was unaware of the seriousness of the exposure to the isocyanate fumes, we held the discovery rule inapplicable. Sealed Air had moved, in the alternative, for summary judgment, and in a footnote we stated that evidence that plaintiff admitted himself into a hospital and described the exposure as directly related to his condition, compelled us to grant summary judgment in its favor.

Plaintiff now moves for reconsideration, arguing that we inappropriately resolved a disputed material fact. The parties have now submitted deposition, affidavit and documentary testimony relating to the issue of when the limitations period began to run. We grant plaintiff's motion to reconsider and rule on Sealed Air's previous motion as one for summary judgment. Based on the evidence in the record, Sealed Air's motion for summary judgment is granted in part and denied in part.

## FACTS

We read the evidence and reasonable inferences to be drawn from it in the light

most favorable to plaintiff, as the party opposing the motion for summary judgment. Plaintiff was operating a large saw at approximately 9:00 a.m. on April 18, 1984, at a Boston plant of Republic Packaging, when he decided to use what he thought was an empty 55–gallon "Instapak Compound A" drum to catch excess debris. Using an acetylene torch he cut the lid off the top of the drum. When the red hot lid fell to the bottom of the drum it interacted with a residue of isocyanate compound, turning the chemical into a dense grayish-green cloud of gas that poured over the top of the drum. Following what he understood to be the correct course of action under the circumstances, plaintiff removed the drum from the enclosed work room by pushing it approximately 30 or 40 feet to the outside, where there would be better ventilation. In the process, the fumes continued to flow from the drum, exposing plaintiff to the isocyanate gas for approximately 5 to 15 seconds.

Plaintiff states that he felt tired after the incident but he continued to work for the rest of the day. At quitting time he mentioned to his supervisor that he felt ill. That night he and a co-worker went to a bar, but he left after a short while, feeling that the smoke was bothering him. Plaintiff developed a bad cough the following day, April 19. That night fluid accumulated in his throat and when he coughed he found blood in his sputum. He admitted himself into St. Joseph's Hospital the next day and informed the doctors that he had been exposed to gas fumes two days earlier, that he had coughed up blood the night before and that he was then short of breath.[1]

Plaintiff was hospitalized for two days at St. Joseph's and on April 22 he released himself because he "was feeling good" (pl. dep. at 55). The medical record reveals that plaintiff was diagnosed as having chemical penumonitis (inflammation of the lungs due to exposure to chemicals), although he states that he was never informed of this diagnosis. Plaintiff admits that a physician at St. Joseph's informed him that tests revealed blood and protein in his urine. He states that he was no longer exhibiting his prior symptoms.

The next day, April 23, he returned to work and related the incident to his supervisor, who recommended that he visit the company's medical clinic. Four days later, on April 27, although he no longer exhibited his previous symptoms, plaintiff went to see a Dr. Voyce at Silver Cross Hospital. He remained at the hospital until May 1, receiving X-ray examinations, as well as blood and urine tests. His urine tests revealed an elevated level of blood cell casts and proteins. Dr. Voyce also observed a dark spot on plaintiff's lower lungs and suggested that plaintiff might be suffering from some pulmonary-renal disease—a pathology which would affect both his lungs and his kidneys. The doctor recommended that plaintiff see a lung specialist and that plaintiff not return to work for a week. Plaintiff states that he felt fine during that week.

On May 7, 1984, plaintiff contacted Dr. D'Souza, a lung specialist at Loyola Hospital, who continued to treat plaintiff until July 7, 1984. On May 15, 1984, plaintiff informed an insurance company that he was feeling fine and did not expect any continued medical care (pl. dep. at 293; pl. exh. 14). While plaintiff's lungs had cleared up, Dr. D'Souza was troubled by the elevated level of blood, protein and blood cell casts in plaintiff's urine.[2]

In August 1984, on Dr. D'Souza's recommendation, plaintiff saw Dr. Gregory Kozeny, a renal expert. Dr. Kozeny suspected

---

**1.** Plaintiff recalls incidents in April 1982, and March 1984, both prior to his exposure to the isocyanate fumes, when he observed some blood in his sputum. On neither occasion was the amount of blood as much as he observed in April 1984. In 1982 he went to a doctor who administered blood and urine tests and a bronchoscope, none of which revealed clinical indicia of illness at that time.

**2.** Although these elevated levels could be detected by sensitive analytical assays, there was no blood or protein visible to plaintiff at the time. However, in August 1984 plaintiff observed some blood on his underwear.

a serious kidney disorder and ordered plaintiff to undergo a biopsy. The biopsy confirmed that plaintiff suffered from a disease known as Goodpasture's Syndrome. This very rare[3] and deadly disease occurs when the body makes antibodies against its own basement membrane, creating an autoimmune reaction commonly affecting kidneys and lungs. The etiology of the disease is not known with great certainty, although Dr. Kozeny stated that patients can be genetically predisposed to it. It can also be triggered by exposure to inhalants or diseases which disrupt the lining of the lungs.[4] Once the tissue is exposed, the body may produce antibodies against its own cells that will attack the kidney, eventually causing renal failure. He further stated that Goodpasture's Syndrome can have a relatively indolent beginning and it may be months or years before a diagnosis is made:

> The time course, people are not diagnosed the first time, because it's an uncommon disease So they usually have months to a few years' history of either nephritis, kidney involvement, hematuria [blood in the urine], or coughing up low levels of blood, until they get a fomenant (sic) episode, which the diagnosis is then made or is fatal.

(Kozeny dep. at 33).

Dr. Kozeny further stated that in his opinion plaintiff's exposure to the isocyanate gas created the "onset of symptomatology" in plaintiff, who, because of a previous history of having blood in his sputum, may well have had a predisposition to the disease (Kozeny dep. at 14). *See* n. 1, *supra.* He prescribed immunosuppressive

therapy for plaintiff, comprised of a combination of two drugs: Cytoxan and Prednisone. This treatment depletes patients' immune systems and therefore makes them more susceptible to other diseases, including malignancies. In September 1986 plaintiff was diagnosed as having cloacogenic carcinoma, a terminal cancer even more rare than Goodpasture's Syndrome. While this type of cancer is not the type which physicians expect to develop from the immunosuppressive treatment, Dr. Kozeny states that the cancer was caused by plaintiff's renal disease and treatment.

The statements of both plaintiff and Dr. Kozeny indicate that plaintiff asked Dr. Kozeny in August 1984 whether Goodpasture's Syndrome could have been caused by the exposure to the isocyanate fumes, but that Dr. Kozeny replied he could not be certain and that he believed plaintiff was predisposed to the disease. Plaintiff then began a "private investigation" of the chemicals in Sealed Air's products and read medical literature relating to his disease. It was not until April 8, 1986, that Dr. Kozeny informed plaintiff that he suspected a causal relationship between the fumes and the disease.

## DISCUSSION

One issue presented here is when plaintiff's cause of action, based on his lung injury, accrued. Since Sealed Air did not receive notice of the lawsuit until April 23, 1986, plaintiff's action, if it is to survive, must have commenced sometime after April 22, 1984. If his entire action accrued

---

**3.** Dr. Kozeny testified that the disease occurs between three in one million patient population and three in ten million patient population (Kozeny dep. at 23).

**4.** Sealed Air claims that this court should not rely on Dr. Kozeny's deposition since it was not given notice of that deposition and was not a party to it. We disagree. Dr. Kozeny's deposition testimony, taken in connection with plaintiff's action before the Illinois Industrial Commission, is as good as an affidavit and may be used by this court for present purposes. *See Hoover v. Switlik Parachute Co.*, 663 F.2d 964, 966 (9th Cir.1981); Wright & Miller, Federal Practice and Procedure: Civil Section 2142, n.

22 (1970) ("A deposition is at least as good as an affidavit and should be usable whenever an afidavit would be permissible, even though the conditions of the rule on use of a deposition at trial are not satisfied"). We see no prejudice in our use of Dr. Kozeny's deposition. Sealed Air was given a chance to review that testimony, to highlight any statements it thought pertinent, and to raise any objections. This court relies upon Dr. Kozeny's testimony only as it relates to plaintiff's medical condition and not as it implicates defendant's action. Under the circumstances, we will allow its submission into the record.

on the date of the incident, April 18, it will be barred.

As we noted in our previous memoranda and orders in this case, for the purpose of commencing a limitations period Illinois courts generally draw a distinction between personal injuries from sudden traumatic events, like a fall, and injuries which gradually manifest themselves over time. *Compare Lofton, v. General Motors Corporation*, 694 F.2d 514 (7th Cir.1982) (fall on pavement while adjusting bus mirror) *with Nolan, supra* (exposure to asbestos). Internal injuries from inhaling toxic fumes can fall into either category, depending on whether the circumstances show that plaintiff should have known at once that there was a compensable injury, *i.e.,* whether plaintiff knew or should have known that he suffered an injury, and also knew or should have known that it was wrongfully caused by defendant. *McDonald v. Reichold Chemicals, Inc.,* 133 Ill.App.2d 780, 274 N.E.2d 121 (3d Dist.1971); *Wigginton v. Reichold Chemicals, Inc.,* 133 Ill.App.2d 776, 274 N.E.2d 118 (3d Dist.1971). The distinction between sudden traumatic injury and injury in the form of latent occupational diseases is important because where a plaintiff suffers from a sudden traumatic event, usually encompassing external violence, a reasonable person would know that there is a compensable injury from the time of the event. *See, e.g., Pszenny v. General Electric Co.,* 132 Ill.App.3d 964, 478 N.E.2d 485, 88 Ill.Dec. 170 (1st Dist.1985).

■ Since plaintiff's lung injury resulted from a traumatic event, we do not apply the discovery rule. We do not think that plaintiff has genuinely disputed that he knew of the injury which led to his April 20–23, 1984 hospitalization, and that it was a likely result of the April 18 incident which exposed him to the isocyanate fumes. While he testified that the doctors never informed him of the diagnosis of chemical pneumonitis, plaintiff admitted that he thought there was a relationship between the incident and the injury to his lungs (pl. dep. at 210–12, 217) and any reasonable person would have understood that to be so. His cause of action for the lung injury therefore accrued, *at the latest,* when he was admitted to the hospital and diagnosed with chemical pneumonitis, if not when he first realized that he was coughing up blood or when he first breathed in the fumes. In that regard, his action is time-barred.

■ While the cause of action based on his lung injury must fail, we hold that the facts establish a separate cause of action predicated on Goodpasture's Syndrome, which may not be timebarred. Under Illinois law, one act of negligence can give rise to separate causes of action based on different kinds of injury. *Clancey v. McBride,* 338 Ill. 35, 169 N.E. 729 (1st Dist.1930); *Stephan v. Yellow Cab Co.,* 30 Ill.App.3d 996, 333 N.E.2d 223 (1st Dist. 1975); *Saunders v. Schultz,* 22 Ill.App.2d 402, 412, 161 N.E.2d 129 (2d Dist.1959), *aff'd,* 20 Ill.2d 301, 170 N.E.2d 163 (2nd Dist.1960). At the time of his hospitalization at St. Joseph's, plaintiff neither knew nor could have known that he was going to suffer from Goodpasture's Syndrome. If a cause of action based on this rare and deadly kidney disease did not accrue by April 22, 1984, it will survive Sealed Air's motion for summary judgment, despite plaintiff's previous knowledge of a different kind of injury to his lungs.

■ Although it is a relatively novel issue, we believe that Illinois courts would hold that prior knowledge of an injury caused by a defendant's actions—with knowledge of those actions—does not necessarily commence the period of limitations for an action based upon a different kind of injury which develops later in time, even if the later injury relates to the same actions that caused the earlier injury. In *Cuerton v. American Hospital Supply Corp.,* 136 Ill.App.3d 231, 482 N.E.2d 187, 90 Ill.Dec. 480 (2d Dist.1985), for example, the plaintiff in a medical malpractice case knew that defendants had negligently used unclean medical products while performing surgery, which gave him an infection and caused a prolonged fever. Plaintiff's knowledge of both his injury and defendants' negligence was documented in a let-

ter sent by plaintiff's counsel just a few months after the procedures. Two years later, the plaintiff became comatose and, after regaining consciousness, quadriplegic, due to defendant's negligence during the previous operations. While the plaintiff's lawsuit in *Cuerton* was filed more than two years after the surgery, and the injury sustained immediately thereafter, it was brought within two years of plaintiff's second injury. The court held that plaintiff's action for his quadriplegic condition was not barred by the statute of limitations, and stated:

> This case presents the novel question of whether prior knowledge of negligent conduct which resulted in one type of physical manifestation of injury precludes the running of a separate two-year period when physical manifestation of another type of injury is discovered at a later date, but whose origin relates to the time of negligent conduct alleged earlier. It cannot be denied that no amount of diligent investigation of the circumstances at the time of the letter ... would have revealed the particular breach of duty which ultimately led to plaintiff's quadriplegia.

The court reasoned that despite plaintiff's previous knowledge of defendants' negligence there could not have been a concurrence of this knowledge, with the subsequent injury, until it actually occurred. Because the type of injury was different in kind, and manifested itself at a different time, the court rejected defendants' argument that the second injury was consequential and held that the case presented two separate causes of action.

We hold that prior knowledge of Sealed Air's alleged negligent conduct, and the prior injury caused by that negligence, does not commence the period of limitation for other diseases or latent injuries which manifest themselves at a later time, as long as the later resulting injury is of a different kind—one which would not have been reasonably foreseeable at the time of the initial injury. We recognize that the Illinois Supreme Court has not yet ruled on this specific issue. However, in resolving disputes concerning the statute of limitations, that court would balance defendants' need for a degree of repose and the law's expectation of a reasonable plaintiff's diligence against the unfairness which would result from a rule that commenced a cause of action predicated on an injury which was unknown and unknowable. Further, a rule which commences a cause of action for unforeseeable injuries which have not yet manifested themselves, would impose an unreasonable and undesirable incentive for anticipatory actions.

We note that this holding is consistent with decisions by courts in other jurisdictions that apply a discovery principle similar to the rule in Illinois. For example, in *Pierce v. Johns–Manville Sales Corp.*, 296 Md. 656, 464 A.2d 1020 (1983), the plaintiff had been employed as an insulation mechanic, where he was exposed to asbestos and asbestos products manufactured by defendant. In 1973 plaintiff suffered from severe chest pain and was diagnosed with asbestosis. He was told that this condition increased the risk that he would acquire lung cancer. Although his previous symptoms persisted, he was reasonably healthy until 1979, when he was diagnosed with adenocarcinoma of the lung—a form of cancer. Plaintiff's survivors brought an action against the manufacturer of the asbestos, which the defendant resisted by arguing that the limitations period commenced when plaintiff first learned of an injury caused by defendant's products. Maryland's high court, applying a discovery rule identical to Illinois', held that plaintiff's knowledge of the asbestosis injury did not cause an action based on his lung cancer to accrue prior to the manifestation of that later injury.

> The rationale underlying statutes of limitation supports the conclusion that having never sought tort recovery for the harm resulting from asbestosis, recovery for the harm resulting from lung cancer should not be barred and that, therefore, a cause of action accrued at the time [plaintiff] knew or reasonably should have known of the existence of lung cancer.

464 A.2d at 1026. *See also Wilson v. Johns–Manville Sales Corp.*, 684 F.2d 111 (D.C.Cir.1982) (applying District of Columbia law to a similar factual setting as *Pierce* and reaching same conclusion); *Sheppard v. A.C. & S. Co.*, 498 A.2d 1126 (Del.Super.Ct.1985) (applying Delaware law, plaintiff's knowledge that defendants' asbestos products had caused him to suffer pleural thickening and blood-streaked sputum did not commence limitations period for cause of action based on asbestosis which developed later in time) (collecting cases from other jurisdictions), *aff'd*, 503 A.2d 192 (Del.1986); *Devlin v. Johnson–Manville Corp.*, 202 N.J.Super. 556, 495 A.2d 495 (Law Div.1985) (under New Jersey law, anticipatory action based on increased risk of cancer due to asbestos exposure was improper because later action for damages from cancer would not be time-barred by previous knowledge of injury).

Viewing the facts most favorably towards plaintiff, we find his Goodpasture's Syndrome to be a rare disease with a prolonged latency period which might not have been known prior to April 22, 1984—two years before Sealed Air received notice of plaintiff's lawsuit. According to Dr. Kozeny's testimony the latency period of Goodpasture's Syndrome, and the difficulty in diagnosing the disease, make it very much like other industrial diseases, such as those which derive from exposure to asbestos, which can only be discovered over time. This description of plaintiff's injury provides the typical circumstances for the application of Illinois' liberal discovery rule. *See, e.g., Taylor v. Meirick*, 712 F.2d 1112, 1117 (7th Cir.1983) (*dicta* stating that the discovery rule was developed in light of injuries where the etiology of the injury is mysterious—"as is often the case with injuries from drugs and chemicals"). Diseases which occur from industrial accidents remain diseases of which their victims may be unaware at the time of the accident, despite the fact that other injuries resulting from incidents may be considered sudden and traumatic. *Accord Guy v. E.I. DuPont de Nemours & Co.*, 792 F.2d 457 (4th Cir.1986) (distinguishing industrial disease from exposure to diisocyanate from normal products liability claim).

Whether plaintiff knew of this later injury, and whether he knew that it might have been caused by Sealed Air's products, are disputed questions of fact. There is no conclusive evidence that plaintiff knew of Goodpasture's Syndrome or his predisposition to it at the time of his exposure. While he was told that he had an elevated level of blood and protein in his urine during his April 20–22 hospitalization at St. Joseph's, Dr. Kozeny's testimony that such indications often do not result in a diagnosis of the disease raises a question as to whether a reasonable person would have known at the time that the isocyanate had caused serious damage to his kidneys. Therefore, a trier of fact could reasonably conclude that plaintiff neither knew nor should have known of his kidney disease until after April 22, 1984. Plaintiff's action may not have accrued until he received an opinion from Dr. Voyce sometime between April 27 and May 1, 1984, that he might be suffering from a pulmonary-renal syndrome, until he was diagnosed with Goodpasture's Syndrome in August 1984, or until he knew sometime thereafter that his exposure might be a cause of his injury. Given any of these circumstances, plaintiff's cause of action based upon his disease would not be time-barred.

## CONCLUSION

We grant plaintiff's motion for reconsideration and amend our February 8, 1988 order. We now consider defendant Sealed Air's prior motion as one for summary judgment. Based upon the evidence submitted by the parties, we determine plaintiff's claim for damages arising from his lung injury which caused his hospitalization on April 20, 1984, and his medical care through July 7, 1984, to be barred by Illinois' statute of limitations. Sealed Air's motion for summary judgment as to damages arising from that injury, is therefore granted. This court also concludes that plaintiff's claims predicated on Goodpasture's Syndrome (and his subsequent cancer) state a separate cause of action which

survives Sealed Air's motion for summary judgment. As to those claims, the motion for summary judgment is denied.